***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner George Glenn and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of the Deputy Commissioner and AFFIRMS with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. An employee-employer relationship existed between plaintiff and defendant-employer at all relevant times herein.
3. Defendant-employer was an approved self-insured with ACE USA/ESIS acting as the third party administrator at all relevant times herein.
4. Plaintiff's average weekly wage was $597.66 per week, yielding a compensation rate of $398.46 per week at all relevant times herein.
5. The parties stipulated that plaintiff had received $8,400.00 in short term disability, the disability plan was fully funded by defendant-employer and that defendant would be entitled to a credit against any workers' compensation benefits plaintiff may receive in this matter.
6. The issues to be decided from this hearing are the following:
 a) Whether plaintiff sustained an injury by accident while in the course of his employment with defendant-employer and/or whether plaintiff developed an occupational disease as a result of his employment with defendant-employer?
 b) If so, what, if any, workers' compensation benefits is plaintiff entitled to recover under the North Carolina Workers' Compensation Act?
7. The following were stipulated to by the parties in this matter:
 a) Plaintiff's Exhibit #2, material data sheets; *Page 3 
 b) Plaintiff's Exhibit #4, plaintiff's medical records.
8. The following was admitted in this matter:
 a) Plaintiff's Exhibit #1, list of hazardous substances located at the defendant-employer's plant;
 b) Plaintiff's Exhibit #3, defendant Response to Plaintiff's 4th set of Interrogatories;
 c) Defendant' Exhibit #1, lay out of the plant.
 ***********
The pre-trial agreement and any and all other stipulations of the parties are hereby herein incorporated into the evidence of this matter as though they were fully set out herein.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing there from, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 53 years old at the time of the hearing before the Deputy Commissioner. He was born on February 28, 1954 and is a high school graduate. Plaintiff began working for the defendant-employer in 1978, and was employed by defendant-employer in various departments until he was terminated in 2002.
2. He worked for defendant-employer continuously until July 12, 2001, at which time he was employed in the shipping department. Plaintiff's responsibilities included preparing product for shipment and using a forklift to load pallets of carbon rods into shipping containers for export purposes.
3. Prior to July 12, 2001, other than his previous knee and shoulder surgery, *Page 4 
plaintiff's health was generally good and he had always been assigned heavy work.
4. On the morning of July 12, 2001 after arriving at work, the shipping clerk, Doug Banks, told plaintiff that they were going to load a container and to get the shipment ready to load when the container truck arrives. Plaintiff and his co-worker, Tony Ollis, began preparing the load of thirteen pallets for shipment, and had it ready to load at about 8:10 a.m.
5. When the container truck arrived, plaintiff and Mr. Ollis climbed down off the loading dock and guided the truck driver as he backed the trailer up to the dock. When plaintiff opened the container doors, he noticed that it was filthy on the inside and had a stench to it. The identity of this substance has never been determined.
6. Inside the container, plaintiff observed a layer of white powder, resembling baking flour, which coated the floor in areas up to an inch deep. Plaintiff's boots and the forklift left tracks on the floor of the container.
7. Plaintiff prepared the container for shipment by nailing wooden guide rails to the floor of the container with an air compressed power nailer. To operate the nail gun, plaintiff had to lean over and put pressure on it against the floor. As he nailed the rails to the floor, the exhaust from the nail gun kicked the white powder up around his face and head.
8. Plaintiff then began loading the pallets into the container with a fork truck, which was powered by propane gas. Once he was inside the container, plaintiff had to rev up the engine of the fork truck to get the hydraulics to pick up the load and stack the pallets. As the engine of the forklift was revved, the exhaust stirred the white powder from the floor into an airborne dust, to the point where it was visible inside the container.
9. Plaintiff could feel himself inhaling the dust while he was inside the container. He continued to go in and out of the container with the fork truck until he had loaded all thirteen *Page 5 
pallets. Throughout this time plaintiff inhaled the white powder as it circulated throughout the container in an airborne form.
10. When plaintiff finished loading the container, he and his co-worker, Doug Banks, closed the doors, at which point Mr. Banks noted that the container had a foul smell. Plaintiff's supervisor, Greg Leonard, testified that of the two men loading the container, plaintiff would have had the most exposure because he was operating the nail gun.
11. Shortly after loading the container, plaintiff began to feel nauseated and sick. He was still not feeling well when he returned to the shipping department a few minutes before the morning break. At about 9:05 a.m., plaintiff sensed that something was wrong and felt like he was going to vomit. He started walking to the bathroom, but before he could reach a bathroom stall, he vomited violently two to three times in the urinal. As he washed his face in the sink, plaintiff noticed that his hands, face, lips and other parts of his body were swelling, and his co-workers also noticed and asked him what was wrong.
12. Plaintiff felt like he was "choking to death" and was scared when he looked at himself in the mirror. Plaintiff had never had an allergic reaction like this before, and other than having to take Benadryl for an occasional bee sting throughout his life, he never had any allergy problems. Plaintiff testified that he had not been stung by a bee on July 12, 2001.
13. When plaintiff's supervisor, Greg Leonard, saw plaintiff's condition, he went to get the golf cart to take plaintiff to the nurse's station. On the way to the nurse's station, plaintiff vomited once or twice more. Mr. Leonard testified that plaintiff was having a hard time staying in the cart, so he held onto plaintiff so that he would not fall out of the golf cart, and helped him into the nurse's station once they arrived. There was no nurse in the nurse's station at the time, and all plaintiff recalls at this point was that he felt like he was choking to death and that his *Page 6 
chest was hurting. Mr. Leonard testified that plaintiff was struggling to breathe. They laid plaintiff down flat on the nurse's table, loosened his shirt, and tried to clean off the vomit with a rag.
14. At that point the Burke County EMS was called and Mr. Scott Rich, EMT was one of the two emergency medical technicians who responded to the call. When Mr. Rich arrived on the scene, plaintiff was laying on his back on the nurse's exam table, complaining of chest pain, shortness of breath, nausea and vomiting, and was sweating profusely. Plaintiff was experiencing pain in his mid chest which is a sign of cardiac-related problems, so he was placed on an EKG to rule out a heart attack, and it revealed that plaintiff had a normal sinus rhythm. He started plaintiff on oxygen and an IV of saline, along with a nitroglycerin tablet and morphine for chest pain, and Phenergan for nausea and vomiting.
15. Mr. Rich testified that plaintiff did not experience any significant pain relief from the medication, and his condition basically remained the same. Upon arrival at the emergency room, the ER staff noticed how red plaintiff's abdomen was, but no evidence was found to indicate any insect bites or stings. Plaintiff's condition was unchanged. EMT Scott Rich testified that plaintiff was in acute distress at the time of the call, and that plaintiff's symptoms that he observed (swelling, redness, pain, shortness of breath, difficulty breathing, redness, and sweating) were symptoms of an anaphylactic or anaphylactoid reaction.
16. Plaintiff was treated in the emergency room for approximately three hours by Dr. John Hamel. He was given two liters of saline by IV and was treated with Benadryl, Solu-medrol, and Zantac for his allergic reaction and Demerol for pain. Dr. Hamel did not know what substance caused plaintiff's allergic reaction, but he opined that plaintiff was exposed to some substance, whether inhaled, ingested, or through skin contact, that caused him to have a release *Page 7 
of histamine which caused an allergic reaction. Plaintiff was released from the emergency department and was sent home to recuperate, with instructions to see his family doctor. The day after his initial allergic reaction, July 13, 2001, plaintiff treated with his family physician, Dr. Charles McGraw. Dr. McGraw is board certified in family medicine, sports medicine and geriatrics. When plaintiff presented to Dr. McGraw on July 13, 2001, he found plaintiff to have hives and was swollen up all over. Dr. McGraw testified that if plaintiff had not been taken to the hospital on the day of his reaction, he thought that plaintiff would have died.
17. After his initial allergic reaction on July 12, 2001, plaintiff continued to have swelling problems for several months. He experienced swelling "mostly every morning" in his hands, lips and ears. He suffered from a general feeling of weakness, lack of energy, and was not sleeping well. Dr. McGraw took plaintiff out of work and he remained out of work for approximately three months until early October 2001, when, at the request of plaintiff, Dr. McGraw allowed him to attempt to return to work. When he started back to work in early October 2001, plaintiff still was not feeling well. In the latter part of the week he began to feel very nauseous and began to have swelling in his genitals. After he worked approximately four days, plaintiff returned to Dr. McGraw, where he presented with pain in his scrotal area (which had been present for three days), nausea, vomiting, and headaches. Dr. McGraw testified that these symptoms were consistent with an allergic reaction or infection, and that it was his opinion that the return to work had caused an exacerbation of the previous symptoms. He prescribed Cipro and bed rest for plaintiff, and took him out of work again.
18. Plaintiff has never returned to work since October 2001. In November 2001, he began having stomach pain and started bleeding out of his rectum. Plaintiff returned to Dr. McGraw and was diagnosed with anal fissures. These symptoms continued throughout *Page 8 
December 2001. Plaintiff asked Dr. McGraw about going back to work, and Dr. McGraw advised him to gradually start building up his activity by doing things around his home.
19. On December 29, 2001, plaintiff's father came over to visit and he noticed that plaintiff was depressed. Plaintiff testified that he has had a lot of depression since his initial allergic reaction and that Dr. McGraw has treated him for depression with medications. He was still taking anti-depressants at the time of the Deputy Commissioner's hearing, and had never been on anti-depressants prior to his work injury.
20. Plaintiff continued to have problems and on January 5, 2002, he was admitted to the emergency department at Grace Hospital, and was treated by surgeon Dr. Keith Forgy. He presented that day with pain in his lower abdomen, and was diagnosed with lower abdominal pain, fever, leukocytosis (elevated white blood cell count), ruptures and diverticulitis with peritonitis.
21. On January 7, 2002, Dr. Forgy performed a Sigmoid colostomy to divert his stool away from the perforated area and drained pelvic abscesses. Plaintiff remained in the hospital until January 11, 2002. He was treated with Cipro and received Vicodin for pain.
22. Dr. Forgy testified that the Cipro that plaintiff was being treated with by Dr. McGraw beginning in October 2001 could have checked the development of the infection "to the point where it took until January 2002 for him to become ill enough for the signs to be evident enough to discover what was truly going on there."
23. Dr. Forgy continued to follow plaintiff for several months after the surgery. On January 16, 2002, plaintiff went to the emergency department again because his wound separated due to significant infection. He was continued on Cipro. He returned to Dr. Forgy on January 18, 2002 where the abdominal wound was drained and examined for infection. At that time *Page 9 
plaintiff was weak and had a poor appetite.
24. From July 12, 2001, through the date of the colostomy, plaintiff continued to experience swelling problems with his hands, feet, face, ears, lips, tongue and other body parts. Plaintiff was unable to work following the colostomy.
25. On or about February 12, 2002, plaintiff received a letter from defendant-employer advising him that he was being terminated and his disability benefits were cut off. After that point, plaintiff was supported financially by his 83 year-old father from February 2002 until plaintiff was approved for Social Security Disability in November 2005.
26. Plaintiff continued to have serious abdominal problems after the colostomy on January 11, 2002. He readmitted to the emergency department with a pelvic abscess on February 18, 2002.
27. In early 2002, Dr. McGraw became concerned about plaintiff's depression and prescribed anti-depressant medication. Plaintiff has taken Cipro for infection continuously since the time of his work injury through the date of the hearing.
28. On or about March 3, 2002, plaintiff again became very sick, had boil-like abscesses around the incision site, and was in great pain. The incision site ruptured on March 4, 2002, and he returned to the emergency department at Grace Hospital. However, due to the amount of infection, the wound was left open so that it could heal from the inside out.
29. In approximately April or May 2002, Dr. Forgy advised plaintiff that the colostomy could be reversed, but plaintiff had concerns due to the fact that he was having discharge out of his rectum. Plaintiff sought a second opinion from Dr. Richard Sigmon, a gastrointestinal specialist in Charlotte.
30. Dr. Sigmon saw plaintiff initially on or about August 20, 2002, and advised *Page 10 
plaintiff not to have the reverse colostomy at this point. Plaintiff continued to treat with Dr. Sigmon for two to three months before he advised plaintiff that his condition had improved enough to have the reverse colostomy. Plaintiff consulted with Dr. Terry Sarantou at Frye Hospital in Hickory on February 10, 2003. However, due to the fact that plaintiff's employment had been terminated and was without health insurance he was unable to have the colostomy reversed until sixteen months later. In June 2004, the colostomy reversal surgery was performed by Dr. Sarantou on June 25, 2004, almost two and a half years after the initial colostomy.
31. Plaintiff has continued to have bowel problems since his colostomy was reversed in June 2004. On average, he has six to twelve bowel movements per day, sometimes with little or no warning. Plaintiff has experienced frequent accidents when he is not in close proximity to a bathroom, and continues to have problems with weakness, fatigue, and shortness of breath. Plaintiff also continues to suffer from restlessness, anxiety and depression.
32. Plaintiff has been totally disabled from the date of the accident through the present time.
33. Plaintiff suffers from chronic pain. He testified that his pain is always present, and that it takes him longer to perform routine tasks of daily living. He described his condition as having frequent weakness, tiredness, stiffness, and that "as far as squatting down and picking anything up, I can't."
34. Plaintiff did not have a history of allergy problems or asthma prior to his allergic reaction at work in July 2001.
35. Dr. McGraw felt that for an allergic reaction to last longer than 24 hours it indicates that it would have to be a pretty severe reaction. Dr. McGraw found that his findings were consistent with the findings of the ER physician, and indicated that when he first saw *Page 11 
plaintiff, he was obviously worse than he was at the ER because he had angioedema, which causes substantial swelling. Dr. McGraw agreed that swelling as described in the ER report could cause chest and abdominal pain, especially if he had an anaphylactic reaction, which the angioedema would indicate, it would cause swelling in your lungs, in your throat and in your intestinal tract. Dr. McGraw further found that the ER records and the EKG ruled out the possibility that plaintiff had experienced a heart attack because his troponins were normal. Plaintiff's white blood cell count was also normal at the ER which indicated that he did not have a significant pre-existing infection at that time.
36. At the July 13, 2001, visit, Dr. McGraw prescribed prednisone (a strong anti-inflammatory steroid), Prevacid (a proton pump inhibitor) to protect his stomach, and Benadryl, an antihistamine. Out of an initial concern that plaintiff's allergic reaction might have been caused due to the use of Celebrex, a non-steroidal anti-inflammatory, Dr. McGraw took plaintiff off of Celebrex. When Dr. McGraw first saw plaintiff, he did not know about his exposure to the unknown chemical powder, and was trying to figure out what might have caused his reaction. Dr. McGraw opined that Celebrex was unlikely to have caused plaintiff's allergic reaction because he had been on it a year or longer. He was of the opinion that if a patient had an allergic reaction to Celebrex, it would be expected to be in the early days or weeks of its use and that if it had been a delayed reaction to the use of Celebrex, taking him off of the drug would absolutely be expected to eliminate the symptoms. He also felt that if plaintiff had a reaction to Celebrex, it would not have lasted this long, so Dr. McGraw felt that it had to be something else.
37. Dr. McGraw testified regarding allergic reactions that a patient can have an allergic reaction to a hazardous substance or compound which would have a substantially prolonged effect on him. He further testified that some people have hypersensitivities to certain *Page 12 
substances or compounds, and that exposure to that substance could affect him for months following the exposure. Dr. McGraw stated that vomiting, which plaintiff experienced initially, is characteristic of a serious allergic reaction where the offensive material is ingested or inhaled. He felt that plaintiff had ingested or inhaled some of the white powdery compound while working in the shipping container. Dr. McGraw also opined that swelling in the abdominal area and intestinal tract could produce a microscopic perforation of the colon or intestines.
38. Dr. McGraw next saw plaintiff on July 18, 2001. Plaintiff presented with chest pain, shortness of breath, blurred vision and headaches, and complained that he felt awful and had no energy. Dr. McGraw felt that "something bad was going on," and "felt that it must have been an allergic reaction to whatever he was exposed to." Plaintiff was also suffering from extremely dry mucous membranes and his face was puffy.
39. Dr. McGraw next treated plaintiff on July 25, 2001, and plaintiff was still experiencing pain, headaches, insomnia, tinnitus, vertigo, and dizziness. His blood pressure was elevated, and Dr. McGraw started him on Antivert (an antihistamine used for vertigo with dizziness), and Cozar for his blood pressure.
40. Plaintiff's next visit to Dr. McGraw was on August 21, 2001. At that visit, plaintiff still complained of feeling awful, had ringing in his ears, was tired, very fatigued, and still had a rash. Plaintiff still had complaints of swelling and exhibited the same symptoms that he had presented with at the initial visit on July 13, 2001. Dr. McGraw put him on Allegra (an antihistamine), gave him another steroid shot of Depo-Medrol, and referred him to an ENT.
41. Plaintiff next treated with Dr. McGraw on September 21, 2001, and was still experiencing swelling and rashes despite taking Allegra and antihistamines. Plaintiff was also experiencing urinary tract symptoms such as dysuria. Dr. McGraw ordered an allergy test called *Page 13 
RSAT testing, but after seeing the results, he stated, "I wasn't really impressed by any of it, that he had a huge allergic problem to any of those things checked for." The test results indicated that plaintiff showed minor allergies to mites and Bermuda grass, and Dr. McGraw stated, "I've never seen anybody get hives from mites." At that time plaintiff's platelet count was low indicating that "platelets are being consumed in some sort of infection, or he has some type of inflammatory process going on in his body." Dr. McGraw discontinued plaintiff's Allegra, increased his fluids and started him on an antibiotic for infection due to his dysuria.
42. Plaintiff's next office visit with Dr. McGraw was October 9, 2001, after his one-week trial return to work period. Plaintiff presented with pain in his scrotal area which had been present for three days, nausea, vomiting, and headaches. Dr. McGraw felt that these symptoms were consistent with an allergic reaction or infection, and that it was his opinion that the return to work had caused an exacerbation of the previous symptoms. Dr. McGraw made a note of a possible diagnosis of prostatitis, but at that time he did not have the test results of plaintiff's PSA limits. Dr. McGraw testified that, "In retrospect, I would say it had to be something else," other than prostatitis because plaintiff's PSA results were within normal limits. He stated, "I didn't have that result when I made that assessment. If he had prostatitis, it would have been elevated, and it was totally normal." Dr. McGraw opined that a patient with a pelvic cyst and infection in the lower abdominal area would exhibit symptoms similar to those of prostatitis. Plaintiff was complaining of pain and his white blood count was elevated (14,900), which indicated the infection was getting worse. Plaintiff's normal PSA indicated that it was likely that plaintiff had an abscess or abdominal infection, and Dr. McGraw stated that, "I think the likelihood is pretty high that that's what it was at that time." He prescribed Cipro, a Rocephin injection, and Demerol for pain. *Page 14 
43. Plaintiff's next visit was on or about October 15, 2001. At this visit, he saw Dr. McGraw's colleague, Dr. Demski. Plaintiff complained of rectal bleeding. He had an anal fissure, which Dr. McGraw felt was related to the ongoing problems for which he had been treating plaintiff.
44. Plaintiff's next visit with Dr. McGraw was on December 7, 2001. Plaintiff was still experiencing health problems, including anal pain and bleeding, and had hives on his buttocks. Dr. McGraw recommended that plaintiff try to increase his activity slowly to build up his endurance because he had been relatively inactive from July through December 2001.
45. Following his colostomy surgery on January 7, 2002, plaintiff's next visit to Dr. McGraw was on January 22, 2002. Dr. McGraw's findings were that plaintiff suffered from a perforated colon, posterior with abscess, and chronic abdominal pain. Dr. McGraw opined that there was a relationship between the microscopic perforation or infection plaintiff suffered, and the rupture that resulted in the surgery on January 8, 2002. He also concluded that this was a continuation of the problems plaintiff had been experiencing since July 2001 and an exacerbation of those initial problems.
46. Plaintiff returned to Dr. McGraw on February 4, 2002, complaining of weakness and abdominal pain. His hemoglobin was low, he was anemic, and his platelet count was elevated due to continuing infection and inflammation.
47. Plaintiff returned to Dr. Forgy on February 12, 2002, where he presented feeling ill, with chills, fever, and joint aches and pains. He had some soreness and tenderness in his abdomen. Dr. Forgy ordered a CT scan of plaintiff's abdomen, which revealed a two centimeter in diameter fluid collection in his pelvis. He was continued on Cipro and Vicodin.
48. On February 18, 2002, plaintiff was again admitted to the emergency room after *Page 15 
experiencing lower abdominal discomfort and pain in his hips and thighs. He was diagnosed with pelvic abscesses and sigmoid diverticulitis, which required another surgery. On February 18, 2002, Dr. Forgy went back in through the incision site and found a 10 to 15 cc. abscess in plaintiff's lower abdomen. He performed a laparotomy and drained the pelvic abscess. Plaintiff was discharged from the hospital on February 21, 2002, and continued on Cipro.
49. Plaintiff's next visit to Dr. McGraw was on February 22, 2002, after he had been released from the hospital following his surgery. He was still complaining of increased pain. Dr. McGraw noted that plaintiff's colostomy was located in the left lower quadrant, which would interfere with his ability to do things, and that plaintiff had a lot of ongoing problems with the colostomy, including several readmissions to the hospital. Dr. McGraw noted that plaintiff was depressed at this visit and indicated that the depression was a component of plaintiff's underlying health condition. At this point, plaintiff was unable to work, and had significant limitations on his other personal activities. Dr. McGraw was of the opinion that plaintiff was able to do very little. Dr. McGraw recommended counseling or psychological treatment for the depression.
50. On March 1, 2002, plaintiff returned to Dr. Forgy and his staples were removed. The next day plaintiff's pain began to increase, which he tolerated until March 4, 2002, when the incision site ruptured and he again returned to the emergency department, and the wound was opened and drained. Plaintiff's last visit with Dr. Forgy was April 5, 2002.
51. Plaintiff returned to Dr. McGraw on April 1 and April 3, 2002, with continued pain and weakness and he was very weak and pale. Dr. McGraw believed that plaintiff had abdominal adhesions because he continued to have abdominal pain, chronic severe pain, abdominal postsepsis from peritonitis to ruptured diverticulum or diverticulitis.
52. Dr. McGraw opined that a person with diverticula is more susceptible to a *Page 16 
microscopic perforation from swelling than someone who did not; that plaintiff was susceptible to that type of perforation; and that to a reasonable degree of medical certainty he believed that plaintiff had an intestinal perforation following his allergic reaction at work. He further opined that a person, who was treated with steroids, as plaintiff was in the months after his allergic reaction, was more likely to have an intestinal perforation.
53. Dr. McGraw testified that if the allergic reactions required the use of steroids, he would say the frequency of intestinal perforations could occur fairly often. He further testified that plaintiff was prescribed steroids on a long-term basis, which could mask the symptoms of a perforation. Also he added that intestinal perforation was a fairly common long term risk associated with taking steroids.
54. In addition, Dr. McGraw indicated that allergic reactions often cause infections because the "immune system is trying to fight off the allergy instead of fighting off other infections."
55. In response to defendant's questions on cross regarding this issue, Dr. McGraw testified that, "The allergic reaction led to him getting prednisone, which more than likely led to him having the perforation. Cause and effect. . . . What I'm saying is that the taking of steroids helped his allergic reaction, whatever he was exposed to led to the perforation." He further stated that, "I think the perforation occurred fairly early on in his treatment, but was masked by taking steroids, . . . the steroids likely contributed to the perforation." Dr. McGraw explained,
 Prednisone can mask infection and weaken tissues to a significant degree. It can cause fractures. It's a double-edged sword. If you're swelling up and having hives and you can't breathe, you're dead. So we use steroids to help the swelling so he can breathe. But a complication and risk of taking steroids is masking infection and making it more likely for you to develop an infection, and making it more likely for tissues to break down and perforate. *Page 17 
56. Dr. McGraw further opined that the swelling he observed at his first visit with plaintiff increased his risk of perforation of the colon and ultimate rupture of the colon.
57. Plaintiff returned to Dr. McGraw on April 29, 2002, complaining of pain and at that point, difficulty sleeping. At that point, Dr. McGraw noted that plaintiff had had an allergic reaction in July 2001, from which he has never really recovered. Dr. McGraw was asked whether it was still his opinion that plaintiff's condition at this point was a continuation of what began July 12, 2001, to which he replied, "It all stems from that."
58. Plaintiff's next visit with Dr. McGraw was on June 21, 2002. At this visit, Dr. McGraw noted that plaintiff had pain every day, he was depressed, and afraid of losing everything because he wasn't able to work. He further noted that plaintiff was also having difficulty sleeping. Dr. McGraw prescribed Wellbutrin for depression.
59. Dr. McGraw opined that plaintiff's depression was a complication of or related to his initial allergic reaction and complications from that reaction. He stated, "I think he was depressed because he was unable to work, and he was sick and had continuous pain. Everything that happened to him from July on."
60. Plaintiff's next visit with Dr. McGraw was on June 28, 2002. At this visit, Dr. McGraw prescribed Celexa an anti-depressant, and noted that plaintiff's depression was somewhat improved, though he also noted that at times he was worried that plaintiff was going to commit suicide.
61. Dr. McGraw moved his practice to Asheville, North Carolina in March 2003, and plaintiff's next follow-up visit did not occur until September 29, 2003. At this visit, more than two years after his severe allergic reaction, plaintiff was still suffering from pain, depression, weakness, and anxiety. He was still wearing the colostomy at that time. Dr. McGraw testified *Page 18 
that plaintiff's medical problems at that time included generalized pain in his abdomen, back, shoulders, and extremities, loose diarrhea, nausea, vomiting, rectal difficulty, diffuse muscle aches, weakness, anxiety and depression, and severe and incapacitating fatigue. Dr. McGraw believed that plaintiff's complaints of generalized pain are consistent with the abdominal allergic reaction type problems and the colostomy. At this point plaintiff had undergone four abdominal surgeries. He was exhibiting numerous symptoms of depression, including: decreased interest in family activities, hobbies, church; crying spells, inability to concentrate, feelings of guilt, sadness, and worthlessness, fleeting thoughts of suicide. These types of depression symptoms had been persistent for two years.
62. Dr. McGraw indicated that plaintiff suffered from major depression, which is depression that is more ongoing, not responsive to the usual medications like tricyclic antidepressants. He also noted that plaintiff's weight was slowed, he appeared malnourished and anxious, severely ill and tearful at that time.
63. Dr. McGraw is of the opinion, to a reasonable degree of medical certainty, that the anaphylactic or anaphylactoid reaction plaintiff suffered on July 12, 2001, was a significant causal factor in the development of his health problems thereafter, which ultimately led to multiple abdominal surgeries including a colostomy.
64. Dr. McGraw is of the opinion that plaintiff has been totally disabled since July 12, 2001 and to a reasonable degree of medical certainty that plaintiff's total disability is permanent.
65. Dr. Forgy is of the opinion that the symptoms that plaintiff experienced on July 12, 2001, were consistent with a severe allergic reaction, and agreed that this would indicate an allergy reaction to something he was exposed to at work. Dr. Forgy additionally believed that plaintiff was totally disabled from the time he first saw him on January 5, 2002 until at least six *Page 19 
weeks after his colostomy closure. Plaintiff's colostomy was reversed on June 25, 2004.
66. Plaintiff was evaluated by Dr. Gary Sigmon, Ed. D. for a Vocational and Functional Capacity Evaluation on February 11, 2005. Dr. Sigmon observed during the evaluation that plaintiff was only able to comfortably tolerate sitting for 30-40 minutes, and standing for 15-20 minutes. Dr. Sigmon opined that plaintiff would not be able to return to the job that he had before as a material handler and fork lift or truck operator or that he cannot perform any job that has lifting/carrying or limited postures.
67. Dr. Sigmon opined that plaintiff is totally disabled as a result of numerous health problems stemming from his initial reaction to hazardous material(s) on the job in July 2001, including chronic abdominal and gastro-intestinal pain, chronic fatigue, shortness of breath, and severe depression. In November 2005, plaintiff was determined to be disabled by the Social Security Administration.
68. Dr. Andrew Mason, a forensic toxicologist, reviewed information provided to him concerning plaintiff and he concluded that plaintiff experienced symptoms consistent with an anaphylactic/atopic or anaphylactoid allergic episode or some other form of hypersensitivity reaction that was initiated during an on the job exposure to an unidentified substance, and that since plaintiff's symptoms were temporally and immediately initiated by exposure to an unknown substance, a strong causative relationship exists between plaintiff's symptoms and on-the-job exposure.
69. Dr. Mason felt that plaintiff's exposure and ingestion of the white powder substance on July 12, 2001, was a significant causal factor of his severe allergic reaction.
70. Dr. Steven Howard St. Clair, Defendant-Employer expert in occupational medicine who did not physically examine the plaintiff, felt that plaintiff's allergic reaction on *Page 20 
July 12, 2001 could have been caused by exposure to a variety of substances including plaintiff's breakfast food that morning, or by food and drink purchased by plaintiff from a vending machine at work.
71. Dr. John Hamel, the immediate treating physician, did not know what substance caused plaintiff's allergic reaction, but he opined that plaintiff was exposed to some substance, whether inhaled, ingested, or through skin contact, that caused him to have a release of histamine which caused an allergic reaction.
72. The Full Commission gives more weight to the opinions of plaintiff's treating physicians Dr. McGraw and Dr. Forgy who treated the plaintiff on an ongoing basis beginning July 12, 2001 and continuing until 2004 and to Dr. Sigmon who performed the Functional Capacity Evaluation.
73. Plaintiff's disability is directly related to his exposure to an unknown industrial chemical(s) and allergic reactions that occurred in July and October 2001.
74. Based upon the greater weight of evidence, the Commission finds that plaintiff's health problems began with his initial allergic reaction to an unknown chemical substance in the shipping container he was loading on July 12, 2001. After that date, plaintiff's health declined steadily, and except for a brief attempt to return to work for four days in October 2001, plaintiff has not worked since July 2001.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows: *Page 21 
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident stemming from his initial reaction to hazardous material(s) arising out of and in the course of his employment with defendant-employer on July 12, 2001. N.C. Gen. Stat. § 97-2(6).
2. Our courts have held that "when the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct." English v. J.P. Stevens Co., 98 N.C. App. 466,391 S.E.2d 499 (1990); Roper v. J.P. Stevens Co., 65 N.C. App. 69,308 S.E.2d 485 (1983), disc. review denied, 310 N.C. 309, 312 S.E.2d 352
(1984). In this case, plaintiff's chronic abdominal and gastro-intestinal pain, chronic fatigue, shortness of breath and severe depression are direct and natural consequences that flow from his compensable July 12, 2001 injury stemming from his initial reaction to hazardous material(s).
3. Plaintiff's medical treatment necessitated by his compensable injury by accident was and is necessary to effect a cure, give relief and lessen plaintiff's period of disability and there is a substantial risk of necessity of future medical. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident including abdominal surgical procedures, colostomy and reversal, related medical visits to treating physicians, and prescription medications. N.C. Gen. Stat. §§ 97-2(19) 97-25.
4. Once plaintiff presents competent evidence of his inability to earn wages, the burden then shifts to defendant to show that plaintiff is capable of obtaining suitable employment, taking into account his physical and vocational limitations. Kennedy v. Duke University MedicalCenter, 101 N.C. App. 24, 398 S.E.2d 677 (1990). Where there is no *Page 22 
evidence to indicate defendant met its burden, plaintiff is entitled to permanent and total disability benefits. Shaw v. U.P.S.,116 N.C. App. 598, 449 S.E.2d 50 (1994), aff'd, 342 N.C. 189,463 S.E.2d 78 (1995).
5. In the present case, plaintiff presented competent evidence of his inability to earn wages, satisfying his burden of proving disability. N.C. Gen. Stat. § 97-2(9). Defendant did not meet their burden to show that employment is available for plaintiff and that he would be capable of obtaining employment, taking into account his physical and vocational limitations. As a result, plaintiff is entitled to permanent total disability benefits at the rate of $398.46 per week beginning July 12, 2001 and continuing throughout his lifetime. N.C. Gen. Stat. § 97-29;Shaw v. U.P.S., supra; Kennedy v. Duke University Medical Center,supra.
6. Defendant is entitled to credit for the short term benefits paid to plaintiff while he was out of work as a result of his injury by accident. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fees hereinafter approved, defendant shall pay to plaintiff compensation at the rate of $398.46 per week from July 12, 2001 and continuing throughout his lifetime. Any accrued compensation shall be paid to plaintiff in one lump sum. Defendant shall be credited for the short term disability payments, which have been made to plaintiff.
2. Defendant shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of this compensable injury when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments and *Page 23 
examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. This fee shall be deducted from the compensation awarded to plaintiff and paid directly to counsel for plaintiff.
4. Defendant shall pay the costs of this action.
This the 28th day of January, 2009.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1